Right, okay, so, and we are going to have two students, I think, present the argument, explain the argument for the petitioner, is that correct? Correct, Your Honor. Okay, and are both of you, I guess, are right there in the same room, or no? No, it's correct, Your Honor. Okay, very good. Well, whenever you're ready, we're happy to hear from you. Thank you, Your Honor. May it please the Court, we have a con on Michael Tetreault on behalf of Petitioner Ibrahin Cutino Espinosa for appearing under the supervision of Catherine Davis as part of the UCI Appellate Litigation Program. We'd like to reserve two minutes for rebuttal. I'd also like to sign a post for the Court that I'll be addressing petitioner's credibility and corroboration arguments while Mr. Tetreault will address his continuance and due process arguments. Very good, thank you. The agency's credibility and determination should be reversed because it is not based on the totality of the circumstances, but rather on two trivial matters that are not probative of credibility as a matter of circuit law. Moreover, those bases were explained reasonably by Ibrahim, and the agency did not offer a cogent rejection of his explanations. The first basis was the fact that his declaration omitted that during the course of his 2016 detention by the Cuban authorities, he was taken for a brief doctor's visit. Under circuit law, this is not a permissible basis because this is a mere detail that was elicited via testimony and is entirely consistent with his prior narrative. Did I understand correctly, too, that the medical treatment was for an earlier condition, not really a result of the beating? No, Your Honor, that specific medical treatment was for panic attack-like symptoms. He testified to high blood pressure and anxiety, presumably induced by his beatings and sleep deprivation and other mistreatments by the Cuban authorities. And this circuit is explicitly held in our own poem, which was cited by Lai directly, that when a petitioner has added details of torture and testimony that were not in the declaration, and those details are completely consistent, the only difference is the level of detail, but that's not a basis for an adverse credibility determination because it's expected that additional details will emerge during testimony, and that petitioner is not limited to just what they wrote in their declaration. Well, you say details, but could the agency view this as an attempt to enhance the severity of the treatment that he suffered during that first incident? Ibrahim, again, this is a totality analysis, so we have to consider both the context of that particular abuse, instance of abuse, which was a five-day detention that involved periodic beatings, and the addition that he was taken briefly to the doctor does not bolster that particular instance. And then we have to put it in the context that this is one detention out of six, 22 cumulative days of detention where he's mentally and physically tortured. And so this is a mere detail of that. It was not offered to enhance the claim. Wasn't it more of an omission as opposed to adding something to it or a contradiction of something that happened before? So an omission is not as significant, correct? Correct, an omission is not significant. Technically, the omission is that what's at issue here is that he omitted in his declaration, and then in his testimony it was elicited by the IJ that he had this doctor's visit. And moreover, he attempted to explain the explanation and offered an overall coherent and compelling explanation, which was he did not include that instance of medical treatment because it was for minor symptoms and he lacked preparation, whereas his later medical treatment, which involved a dislocation of his arm, he included despite not having corroborating evidence. There was another problem that the IJ had, though. That was the wrong date for his alleged mistreatment or his beating. Isn't that more significant? So that was the second basis, and I'll turn to that now. So Ibrahim's application listed November 17, 2018 as a date on which he was beaten. His declaration and his testimony corrected that to say that he was released on that date but not technically beaten. He was detained from November 10, 2018 to November 17, 2018, and the agency is myopically focused on what exactly happened on one date out of a seven-day detention. Again, out of 22 cumulative detentions over the span of three years, circuit laws made clear very explicitly in Wren, but carried forward in other cases, that when you have a minor date discrepancy that cannot be viewed as an attempt to bolster a claim, that's not probative credibility. But what about his explanation for it? His explanation didn't seem to make much sense. He said that he put that down because that's the date he was fined, and the NJA thought that really didn't make much sense. Shouldn't the court look to what his explanation was in determining credibility? The court should look to his explanation, and his explanation here was misunderstood by the agency specifically. Admittedly, he's a pro se, non-English-speaking applicant. He's doing the best he can, but his explanation makes sense under circuit law. The court has recognized in saying to Gonzalez and Onward that the memory is imperfect, especially for victims of abuse, and that reconstructing the timeline can result in errors. So his statement that I included that date because it appeared on my fine, his statement of where it came from explains why he put that date in. Namely, in reconstructing his lengthy timeline of abuses at the hands of the Cuban government due to his activism, he made an error and he accidentally said he was beaten on one day that he was not beaten. He was still detained on that day, but he was not beaten on that day in particular. And agencies zeroing in on that one day in isolation of an entire record of compelling, consistent, and corroborated testimony warrants reversal. And as a final matter, the court has noted that asylum applications by pro se litigants should be read charitably. I see my time is about to run, so I'm going to hand it off to Mr. Tetreault to please report. Okay, very good. Thank you. Good morning, Your Honors. This court should reverse because the agency denied a continuance without analyzing the factors that this court laid out in the Cui v. McKessie and mandated that it analyze in Plantes-Lopez v. Barr. The holding in Plantes-Lopez indicates that this is an abusive discretion in itself. Furthermore, the Cui factors counsel in favor of continuance in this case. First of all, the importance of the evidence excluded were eyewitness statements that tell fine testimony. The testimony was particularly valuable because it would have given Abraham a chance to offer favorable testimony other than his and allow the court to find the truth via cross-examination. Likewise, the two letters were from eyewitnesses to his torture at the hands of his Cuban regime and one from an M1R activist, much like himself, considering the M1R's existence was at issue. This was a matter that was important to the court. Secondly, the unreasonableness of his actions. His actions in delay of starting to put his package together were not unreasonable. He was given two months and 12 days to put his entire rule and asylum application together. This court held in Cruiser and Don. That is not unsurprising that an applicant can't put their case together in two months. And in that case, the applicant had the help of counsel, and all of their evidence was sitting right here in the United States. Abraham, of course, was pro se, and all of his evidence was sitting in Cuba and made a circuit through his route to the court. Can I ask you a question that maybe I should have asked your colleague, but it's sort of about the relationship between the two things that you're both arguing. So if we agree about the adverse credibility and think that there's not substantial evidence to support what the agency held on adverse credibility, would your client win just on his testimony alone? Would he need the corroborating evidence that you're arguing about? Yes, Your Honor. We do believe that the entirety of the record should be considered here, and the fact that there were multiple pieces of probative evidence completely excluded from the trial on remand should be then considered. That's what this court said in Hallam, that an adverse credibility should be determined on the entirety or the totality of the record. Sorry, can I try asking again? So his testimony about all of the abuse he suffered, if that's credited, do you even need the documents that you are asking us to have considered? No, Your Honor. We believe that that satisfies the elements of the filing. Further inconvenience to the court, the DHS attorney did not oppose the continuance for this court's holding in Zandling, Jiang v. Holder. That is evidence of no inconvenience to the court. Finally, continuances granted. There were none in this case. Even during the height of the pandemic, when even the Supreme Court was granting five months of continuances for cert petitions, Eberhain was not granted a continuance. This court should remand so Eberhain can present the telephonic testimony and have his eyewitness letters reviewed. I'd like to make three points about due process moving on, if there are no more questions about continuances. First, it was a failure to develop the record for pro se litigant. The judge, the IJ, has an affirmative duty to uncover all relevant facts, both favorable and unfavorable. There's a lot of diving into the negative facts here, but precious little development of the record for favorable ones. The incomplete record excludes any development in the form of testimony about actual country conditions exhibited on the ground, history of family persecution. The record excludes the two letters and telephonic testimony, as previously stated. And the record is devoid of any narrative testimony or advocacy on Eberhain's behalf by himself. That brings me to my second point on due process. The IJ had a duty to give Eberhain notice and an opportunity to speak in a narrative and advocate for himself. That notice was never given. Respondent claims that this was secured when the IJ asked him if he had anything else to add to support his claim, but this court has held multiple times over the years, specifically in Colmenar. That is enough. Where no notice is given, that's not a meaningful opportunity to speak in a narrative form. He didn't know he could advocate for himself. Eberhain had no advocate. What is it that the IJ should have said to him in your view of this? What should he have done? Your Honor, the IJ needs to explain the procedures to the applicant and let the applicant know that they'll have an opportunity to say whatever they want, however long they need to say it. Well, didn't he tell them that? Didn't he tell them that you can speak and tell us whatever you want to say about it? He certainly said that to him, didn't he? No, Your Honor. He said the first time, he said, do you want me, correction, anything else you want the court to know regarding your case? That was the extent of it. Then the second time, he said, do you have anything you want to say in response to what Mr. Goldstein said as to why your application should be denied? That's on 244 and 250 of the administrative record for your review. That there is exactly what Colmenar said was not enough. Finally, the third most prejudicial and most prejudicial violation of due process was the testimony surrounding the events of November 10th through 17th, 2018. The evaluation caused so much confusion in the merit hearing that it took almost eight pages of testimony and repeat repetition of the question seven times to get that same question, what happened on November 17th. It culminated in the IJ and DHS attorney speaking amongst themselves about what he meant when he was beat and dispatriotized when either of them tried to clarify that IJ curtailed his testimony right there. So I understand that there was a lot of confusion. There was also the later November date that they were talking about. There was a ton of confusion about what happened in November and what happened with which date. But ultimately, it looked to me from the transcript like it got sorted out. Like the IJ ultimately said you should have written down the date you got beaten instead of the date you were released. And I'm not sure that better audio would have changed that, but can you explain why you think the audio really affected the bottom line of what happened? Yes, Your Honor. So during that entire eight pages of transcript, the IJ was focused on troubleshooting the issue several times. He tried to explain what he meant, and the IJ was going on and off the record, was asking the DHS attorney to hang up and call back in, or asking the DHS attorney to go on and off speaker phone. These were during times when Ibrahim was actually trying to make his explanation. So it's not surprising that the IJ was not able to understand the explanation. I mean, I thought the explanation was I put down the date I was released, which is the date of the fine and the document I had, even though I was actually beaten a few days earlier. I mean, isn't that the explanation? And didn't the judge understand that that was the explanation he was giving? Well, Your Honor, yes, that's the explanation that he gave, but the reasoning is valid there. So the reasoning he gave is because that's how he was able to reconstruct the entire events of November 10th through 17th. We may or may not agree with you about whether that reasoning is valid. We might agree with you, but I'm just still having trouble understanding why the audio, what we should understand about the audio and what the explanation. I mean, are you saying the explanation would have been something different if the audio had been better? Your Honor, we believe that the explanation would have been understood better if the IJ was not troubleshooting during this time. I see my time has run, and I'm happy to continue to answer the question. You should complete your answer to Judge Friedland's question, and then we'll be sure to give you a couple minutes for a follow-up. Yes, Your Honor. So we believe that the explanation would have been fully understood, and the IJ would have understood that during periods of torture like this, the ability to reconstruct dates would have been highly predicated on something like keeping of records for dates of release and things like that. Furthermore, the box on the application is, you know, one inch by six inches. The fact that he's got as much details as he could put in there is, you know, it's not surprising that he was able to expound on his explanations just a little bit more in the declaration and furthermore in testimony during that time. But the testimony, obviously, was infected with some severe confusion as well. Okay. All right. Thank you very much. As I said, we'll give you some time for rebuttal. Let's hear now from counsel for the Attorney General. Thank you, Your Honor, and good morning. I'm Spencer Shukart for the Attorney General. Let me update the Court. I want to begin just by congratulating my colleagues over there for an excellent argument. I thought they did a great job. Now, in this case, the agency did a thorough and professional job conducting hearing, safeguarding the petitioner's rights, and in the end came to a reasonable conclusion that the petitioner was not credible, that he had not corroborated his claim, and used good judgment in denying his continuance. Now, petitioners have placed a lot of issues on the table, but it seems to me that this case ultimately is going to come down to credibility and the continuance, and I'm going to focus on those. Beginning with his credibility. Now, just to begin, I want to point out our standard of review here. Under Ming Dai, only if the evidence compels you to reverse the agency can you reverse the agency. That's a high standard. This Court has described it as an extraordinary circumstance. Now, the agency rested its credibility determination on two findings, both of them having to do with persecution. One is about a beating. One is about a hospital stay. With respect to the beating, the petitioner's inability to consistently relay this detail is not trivial, and it's not a date discrepancy as they describe it. It's a discrepancy about a beating. The date is irrelevant. The date is static. It doesn't change. No one is disputing that we're talking about November 17, 2018, but we're talking about two different versions of what happened on that day, and that matters. It's a big deal that he lives to see another day. The date, though, I don't understand what you're saying, because I think he has consistently said he was beaten during that seven-day detention. He twice, I think, in his written affidavit and then in his testimony, said it was actually maybe a few days before the 17th, but he wrote down the 17th because it was what was on the receipt. Once he wrote down that it happened on the 17th, so the difference seems to me to be, was he beaten on the 15th or the 17th or maybe the 14th or the 17th? Why isn't that a date discrepancy? Well, the date discrepancy here is between his application and his testimony, because he's clear in his application he's talking about the 17th. He says what happens. Nobody prompted him to write that. That didn't come out in cross-examination. Then why isn't that just a mistake of writing down November 17th instead of writing down November 15th when it really happened? He doesn't identify November 15th or any other date. In his declaration, he talks about an earlier detention where he was beaten for some period of time and then released seven days later. It's actually a third version of the story, although we don't have a finding about it. But I think that just kind of puts the illustration that we're not talking about a date. We're talking about what happened to him, whether or not he was beaten at all, because I was released on that day, I was beaten on that day. Those are very different things, and it has nothing to do. He could have been talking about November 18th, November 30th. Yes, he was beaten. I mean, it's undisputed that during that time period on both declarations of the hearing that he says he was beaten. That was the point that Judge Griggled was raising. He says he was—I mean, again, the declaration is different from his application, and we're talking about a distinction here, one that he could have easily explained by saying, oops, I wrote down the wrong date, but that's not what he said. What he said was simply he just reframed the question as a statement, I wrote down the date based on the evidence that I have in my hand, indicating that he's saying that he was beaten on that date. That's actually distinct from what he said in his declaration. And it's not about the date. It's about the quality, like the quality of his evidence. As he says, I wrote down the things that I had in my power. So on the one hand, we have on this day I was beaten, and on the other hand I have on this day I was released. Those are diametric opposites. That's not—I was actually struck by something the petitioner wrote in his reply brief, talking about Wren, which I believe is the case where the immigration judge was quibbling about whether it was the second or the third day that the petitioner was forced to make a raincoat or wear a raincoat. And it's the persecution that's the thing. That's what we're arguing about here. He didn't make a mistake about a date. He made a mistake about what happened to him on that day. These are evident events that he elicited from his own testimony. These weren't things that were brought up on the cross or anything like that. And he couldn't explain it. Do you agree that—I'm sorry. Do you agree if we find one of the two bases that the immigration judge relied on for credibility was error, that we have to then remand? No, not at all. I think that's an improper reading of the law in New Orleans, which is where that argument came from. I think the petition does make a number of sort of actuarial claims related to his credibility, comparing his case to other cases where there were six discrepancies versus he had only two, or cases in which there was only one inciting incident, whereas he has a whole quote-unquote saga. But Alam is a very clear warning against doing adverse credibility arithmetic. We're not here to count inconsistencies. We're here to look at the totality of the circumstances. So even if you decide one of these is so erroneous that you're compelled to find that it's not accurate, the other one, either way, can still sustain the adverse credibility charge. But doesn't the totality of circumstances undermine the very argument that you're making? We don't have that single-factor rule any longer under the totality of circumstances. So if one major portion is missing, wouldn't it have to be remanded to the IJ to have him consider the record as a whole? No, there's no evidence that the IJ didn't consider the record as a whole. The question would still be under the totality of circumstances. Is that, are these inconsistencies enough to sustain the credibility charge if one is still enough after all? It just doesn't have to be enough. But we don't know that the IJ would say that one was enough. Well, the IJ had more concerns than just the two of them we're talking about. But again, if you're going to IA, then, excuse me. Sure. If we don't agree with any of the reasons given by the IJ and think that the two that the BIA chose, when it seems like the BIA rejected the others, that the BIA chose two and thought they were enough, if we don't think either one of those is enough, would we remand for his testimony to be credited as true at this point? No. No, I don't. Well, if that's the only credibility determination we have left and we're agreed or you're agreed that they're not enough, then I think that you would remand based on him being a credible witness. It still wouldn't be enough to grant his case. It would still require remand and rehearing. Why would we do that? I gathered that the IJ had, I don't know, what, eight, some larger number of grounds, many of which the BIA, I thought, just simply did not reach. Did you read the BIA's decision as having rejected those other grounds? I know the BIA made an even if sort of determination when it said that even if these things were true, these two inconsistencies are enough. So I don't think they addressed that. Did they say even if these are not true, the other two are enough? I thought there was a hint that it thought the others were not okay. I mean, I don't really want to read the tea leaves that way for the client when they haven't said it themselves. But, yeah, what I was asking is what is the government's position on the nature of the remand that would occur? You just, I think, agreed that we would send it back and tell the BIA you must now deem his testimony to be credible. I was asking, I was kind of surprised that that was your position because I understood there to be a number of other grounds that were kind of left on the table. But if I'm wrong about that, that's what I'm trying to get you to clear up. No, you're right, Your Honor. I think that I mischaracterized that. I think that those other, the board never spoke clearly on those other, whatever number it was, of the credibility findings. So I think that you would remand it to the board to take a second look at the totality in light of that to either speak on them or remand to the IJ to clarify them if that's what it wants it to do. So, yes, thank you for allowing me to clarify that. Well, if we were to send it back even for the BIA to do that, is it sort of on an open record where the petitioner could now, you know, rely on additional evidence that he wasn't allowed to present at the first hearing? No, because the denial of the continuance was not an abuse of discretion, much less a denial of the process. And keep in mind, I'll move on to the continuance, but the board didn't abuse discretion in denying the continuance because his conduct was legally unreasonable and he didn't show good cause. He was warned, urged by the immigration judge from the beginning to immediately begin gathering his evidence, begin talking to his witnesses, and not to wait for the vain hope of parole to go on a non-attained document and have a longer fuse on the evidence. And he admitted that he didn't do that. Page 250 says he tripped himself up because he listened to his family who told him you're going to get parole. But that's only one of the factors that you had. Even if you were correct about that, the unreasonableness of his conduct, there are other factors that were not considered at all. The importance of the evidence, inconvenience to the court, number of continuances previously granted, and they all seem to me to justify a continuance. Even if you were correct about the unreasonableness of the conduct, and there is a substantial question, it seems to me, whether that conduct was unreasonable. But the court didn't even address the other factors. The court wasn't required to address the other factors. I gave this argument sort of short shrift in my brief, so I'll expand on it now. Plaintiff Lopez does not require the agency, does not mandate that the agency look at the four quid factors in every case. Plaintiff Lopez clearly says that the court, your honors, has to apply the quid factors when it reviews the agency's decisions. And it's true that it found that the board erred by not looking at all those factors. But if you read the following analysis, it's clear that what they're saying is what's always been said since Rendon and previous is that the court has to look at it. Even if you were correct about that, if we look at the factors, this was important evidence. There was no real inconvenience to the court, and no continuances had previously been granted. So why don't those factors, even if we are the court that looks at it, why aren't they in favor of granting the continuance? Unreasonable conduct on the part of the petitioner is enough on its own to support the denial of continuance, especially in this case when it's egregious. How is it egregious? I mean, it seems like he only had a short period of time. He actually got some other evidence. And while the country was shutting down because of COVID, I don't understand how there was anything egregious here. Sure. I'll go through it again. So he was warned from the beginning, don't wait, don't wait. And the fact that he had very little time is what actually makes it worse on his part because he didn't have time. He was told he didn't have time. And he gathered some things. I mean, he gathered some other evidence, and then he had a little bit more later. I mean, it wasn't like he did nothing. Doing nothing is not the only unreasonable course of action, Your Honor. He waited around for a month, hoping, hoping, hoping that he would be released, and he wasn't. Because, as you say, the pandemic came. They stopped releasing people after that point. And he did it for no reason. He did it just out of hope. And he gathered evidence. He started belatedly. He appeared in court three weeks, roughly, before his merits hearing. And the immigration judge asked him at the time, how was he coming with his evidence. He said, fine. He didn't say that he had waited. He didn't give any hint as to what was going on. He said his evidence was ready. It was coming. And then when he went to his merits hearing, he, again, didn't ask for a continuance until after evidence was closed, until the immigration judge had ruled, and it was clear that the immigration judge didn't believe him, and had found that he wasn't credible. And then, I think it's on page 253, he makes his oral motion. Oral motion, he's a pro se petitioner. But his showing of good cause is, I was going to ask for a continuance, but I didn't. That's not good cause, and it's not reasonable behavior. And this is a reasonable, or it's a non-intrusive discretion to deny this continuance. And there's no prejudice in any case, because I know you mentioned that he got some new evidence, but it is of the same quality as the evidence that the board already determined wasn't corroborative. It's generic. It's just, it's more. Well, his new evidence that his, I believe it was a nephew and another member of the organization that he said he belonged to, they testified that they had witnessed actual beatings. It was different than his sister's letter, correct? More persuasive than his sister's letter. I mean, the board didn't find it, so. You could see that when they rejected the hypothetical request for remand, they clearly didn't find that it was materially different, and it wasn't. And again, he's not credible. Did the board say that, that it wasn't materially different? Did they reach that finding? The board, in a footnote, arguably said that Petitioner hasn't asked for a remand based on his new evidence, and essentially looking at the quality of it, you can see why. So they've tipped their hand as to how they view this evidence, although I don't think you could actually call that a distinct finding. I don't understand how you're reading it that way at all. It says, likely because such a remand would not be warranted if the evidence were previously available. That's about the timing, again. That's just doubling down on the timing. I mean, I don't understand how that has anything to do with its persuasive value. It's in a sense. I mean, I just try to read it differently, Your Honor. How do you read it to mean something about the persuasive value? It said a remand wouldn't be warranted even if it was timely. Even if it was timely. I don't know what that's a comment on other than the quality. It doesn't say even if, though. It says he doesn't ask for a remand based on this new evidence, likely because such a remand would not be warranted if the evidence were previously available. Well, I think one of the themes of this argument today, Your Honor, is charitable reading of words and statements. Even if and if are pretty different, isn't it? I mean, I don't know if that's a very different reading. Inserting even does change what that would mean, but it doesn't say even, so I don't understand why you would insert even. It's clear to me, Your Honor, but I just see it differently. It looks like I'm out of time. It's a good place for you to stop, I agree. Thank you to Clark for a vote. Thank you for your argument. And we'll hear from counsel for the petitioner. You're on mute, I think. Excuse me. Thank you, Your Honor. I'd like to make a few points. Firstly, I want to address the fact that a respondent distinguishes Wren because he characterized the facts of Wren as whether the petitioner in that case was forced to be put in a raincoat on the second or third day. What was that issue there? And when I address it in the reply brief on page 10, it's not that he was put in a raincoat, but that he was put outside in heat and forcibly fainted on the day. And the question was, was it the second day or the third day? The raincoat isn't what's at issue. It's whether did the abuse happen on day two or day three. And similarly here, there's no question that he's detained through the 17th. The question is, well, was he further beaten? Similarly, it's on all fours with Wren. Regarding Kumar, Kumar is a very recent case interpreting Alam and found that in that case the panel rejected four out of six of the bases and remanded for a determination under the totality. And so to answer the question, if this panel reverses one of the bases, then remand at a minimum would be required, but the court also would be entitled to fine that the credibility determination can't stand under the totality. Regarding whether Judge Friedland's question about whether corroboration is still relevant, if the credibility determination is reversed, it is relevant, and that is the whole point of Wren and his progeny, that when a credibility determination is reversed, is erroneous and reversed, then remand has to be granted with an open record so that additional corroborating evidence can be provided. But only if corroboration is needed. I don't understand here. If the IJ credits his testimony, which could happen, and in fact I think it's within our power probably to order it in this case, at that point you only need corroboration if his testimony isn't enough on its own, and it's not obvious to me that it wouldn't be enough on its own. It seems like you would have an even stronger argument, it basically is what I'm saying. I don't know that you need your corroboration. I would agree with Your Honor. The Real ID Act suggests otherwise, but if that's what the panel would like to hold, we agree with that. I understand that you need the opportunity for corroboration, but is there something about the Real ID Act that says you have to have corroboration in every case? Maybe I'm missing something. Okay, so 8 U.S.C. section 1158, B1, B2, when the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be- With when? So I just don't know that we're in the situation yet where the trier of fact has determined that there needs to be corroboration, because we didn't have a situation yet where they were crediting his testimony. If that were happening, we don't know whether they would think corroboration was needed also. It's entirely up to this panel to make the determination on that issue. I point to Xi and Ren and Lai and Vitargey Lynch for the court's guidance on that issue, but it's up to this panel. Okay, all right. Thank you very much for your argument. Before we let you go, we'd like to extend our thanks on behalf of the court to you and your colleague. There you are. Just a terrific job, as even your opponent was kind enough to acknowledge. It's just I can't tell you how helpful it is to the court to have folks like yourself be willing to step in, put in all the time and effort to do the briefing, come forward for the argument, and really provide a benefit to both the court and, obviously, to your clients. So thank you again for your willingness to take on that task. We appreciate it. Thank you, Your Honors. Thank you, Your Honor. All right, the case just argued is submitted. We'll move to the next case.
judges: WATFORD, FRIEDLAND, Amon